# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1772NE

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court |
| | * | for the District of |
| | * | Nebraska. |
| Veronica Eustaquio, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 15, 1999

Filed: December 13, 1999

_____

Before RICHARD S. ARNOLD, JOHN R. GIBSON, and BEAM, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


Veronica Eustaquio was charged with possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The defendant filed a motion to suppress a package containing one-half kilo of cocaine, which was found in a search of her person. The District Court denied the motion. The defendant entered a conditional guilty plea, reserving her right to this appeal. She was sentenced to twelve months of imprisonment and a four-year term of supervised release. On defendant's appeal, we now reverse.

# I.

On September 19, 1997, the defendant arrived at Eppley Airfield in Omaha, Nebraska, on a Southwest Airlines flight. Investigator Lutter and Sergeant Burns, members of the Commercial Interdiction Unit of the Nebraska State Patrol, observed defendant leave the plane and walk through the airport directly to a taxi stand. The officers, noting that the defendant did not stop for any luggage, and believing she was acting "as if she was forcing herself to appear relaxed," approached her at the taxi stand. Lutter and Burns identified themselves as law enforcement officers, and asked if they could talk with her. The officers explained that she was not required to do so, and could leave. The defendant indicated that she had a minute.

The defendant gave Lutter her California driver's license and plane ticket when asked to do so. The ticket was a one-way fare from Ontario, California, which had been purchased that same day with cash. Lutter then informed the defendant that he was a narcotics investigator looking for people carrying drugs into Nebraska. Lutter asked the defendant if she had any contraband with her, and the defendant responded that she did not. The defendant then allowed the officers to search her luggage. When asked why she had come to Omaha, the defendant replied that she had come to visit friends and family. Lutter testified at trial that at this point defendant was looking increasingly nervous, and held her jacket over her crossed arms very closely to her body. Lutter asked to search her jacket, and defendant again consented.

Lutter, still suspicious, asked the defendant to pull her clothes tight against her upper body. He demonstrated with his own shirt what he wanted her to do. Defendant did the opposite of what she was asked, and pulled her shirt away from her body. Despite this, Lutter saw what appeared to be a line or a bulge just to the outside of her body. Lutter "reflexively" reached out and poked the observed bulge with his finger, and asked what it was. The defendant jumped back, and told Lutter that he could not touch her.

At this point, Lutter told the defendant that he was detaining her, and that she must accompany him to the interdiction office at the airport. Once at the office, Lutter told the defendant that he was going to apply for a warrant to search her. She responded that Lutter should just go ahead and search her. Lutter explained that she did not have to allow this search, and that there was a chance the warrant might not be granted. Defendant again stated she could be searched.

Officer Russo, a female airport police officer, took the defendant to a room in the back of the interdiction office. After again receiving the defendant's permission, she began to perform a pat-down search. Ms. Eustaquio then produced a package from beneath her corset containing 500 grams of powder cocaine.

After several hearings, including an in-court demonstration, the District Court reached the following findings and conclusions: (1) the officers could not have determined that the defendant was concealing contraband on the basis of visual observations only (although they could have determined she was wearing a corset); (2) defendant's detention began when Lutter observed the bulge in the defendant's clothing as she pulled her shirt away from her abdomen; (3) that detention was supported by reasonable suspicion of criminal activity; and (4) that probable cause to search the defendant existed from the moment she failed to follow the officer's request to manipulate her clothing.

II.

The first question we must decide is at what point the encounter between the officers and the defendant stopped being consensual, and became a detention. At that point, the encounter becomes a Fourth Amendment seizure, and must be supported by reasonable suspicion of criminal activity. See United States v. Sokolow, 490 U.S. 1, 7 (1989). We review the trial court's findings of fact under a clearly erroneous

standard, and review the determination of the existence of reasonable suspicion de novo.  See United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994).

The District Court found that the detention began when Lutter observed the bulge in the defendant's clothing as she pulled her shirt away from her abdomen. Alternatively, the government argues that the encounter was consensual until Lutter touched the bulge in defendant's midsection.

The government offers the following as grounds for reasonable suspicion of criminal activity:  (1) defendant's exhibiting nervous movement and a straight-ahead gaze; (2) defendant's choice of a direct path to leave the terminal; (3) defendant's not having any checked luggage; (4) defendant's arrival from a source city for narcotics trafficking; (5) defendant's same-day purchase of a one-way airline ticket with cash; and (6)  the fact that there were no friends and family meeting defendant at the airport. If we accept the government's argument that there was no detention until Lutter touched defendant's midsection, the government gets the benefit of two additional factors supporting reasonable suspicion:  (7) defendant's doing the opposite of what Lutter asked, and pulling her shirt outward instead of toward her body; and (8) any bulge that Lutter might have seen.

Even if we accept the government's position that no detention and seizure occurred until Lutter touched the defendant, we hold this detention was not supported by articulable reasonable suspicion.  Even when viewing all the facts collectively, see United States v. Campbell, 843 F.2d 1089, 1093-94 (8th Cir. 1988), and taking into account the officer's prior experiences and knowledge, see United States v. Ortiz, 422 U.S. 891, 897 (1975), we are convinced the officers could not reasonably suspect the defendant of any criminal activity.

The District Court gave no significance to defendant's route from the plane to the taxi stand, and we agree.  Likewise, we share the District Court's doubt in an

interdiction officer's ability to distinguish a person who is "acting as if she was forcing herself to appear relaxed." Such an opinion is too subjective to bear much weight. The District Court specifically found that prior to poking the defendant's midsection, the officers could not visually detect anything other than the presence of a corset on the defendant's person. The defendant was under no legal obligation to manipulate her clothing when Lutter requested that she do so. The defendant was traveling without having checked any luggage, she bought a one-way ticket with cash, and nobody met her at the airport. Too many people fit this description for it to justify a reasonable suspicion of criminal activity. See Crawford, 891 F.2d 680, 682-83 (8th Cir. 1989).

This case is similar to United States v. Tovar-Valdivia, 193 F.3d 1025 (8th Cir. 1999), recently decided in our Circuit. There, given similar circumstances, we held officers did not have probable cause to arrest Tovar in a bus station when he appeared to be in a hurry, carried a new bag, arrived from a source city for narcotics, and had observable bulges under his shirt. We specifically noted that the presence of the bulges could have been bandages, a money belt, or any number of non-contraband items. In Tovar, even after the officer felt a bulge and determined it was not a part of the defendant's anatomy, we held the officer did not have probable cause to arrest. In the instant case, the District Court found that probable cause existed from the moment defendant failed to follow the officer's request to manipulate her clothing. In light of Tovar, it is clear the District Court erred in this determination.

Therefore, we hold that at the point that Lutter reached out to touch defendant's midsection, he did not have a reasonable suspicion based on articulable facts of any criminal activity. The parties do not appear to dispute, nor do we have any trouble holding, that the subsequent touching of defendant's person amounted to a Fourth Amendment detention and seizure. This touching was not supported by reasonable suspicion or probable cause, and therefore violated the Fourth Amendment.

## III.

As the touching of the defendant's midriff area was violative of the Fourth Amendment, any evidence resulting therefrom is inadmissible and cannot be used to determine whether there was a reasonable suspicion to detain or search her. Defendant did submit to a pat-down search a few minutes later which led to the discovery of the drugs. However, the taint of the earlier detention and seizure was not removed, and this acquiescence was therefore the fruit of the illegal detention.

Accordingly, we reverse the conviction and sentence and remand to the District Court for such proceedings as may be consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.