# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-4523

_____

United States of America

*Petitioner - Appellee*

v.

Jesus L. Garcia, also known as Ramon Santos

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 17, 2017
Filed: May 1, 2018

_____

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Defendant Jesus Garcia appeals the district court's[1] denial of his motion to suppress evidence of the methamphetamine that Investigator Mark Plowman found

_____

[1] The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska, adopting in part the report and recommendation of the Honorable F. A. Gossett III, United States Magistrate Judge for the District of Nebraska.

in Garcia's luggage. Garcia argues that the initial encounter with Investigator Plowman was not consensual and constituted an unlawful seizure. He further argues that he did not consent to Investigator Plowman searching his bag, so the search was also unlawful. We disagree and affirm the district court's denial of Garcia's motion to suppress.

## I. Background

On June 4, 2015, Garcia was aboard an Amtrak train at the Omaha, Nebraska station destined for Chicago. Investigator Plowman and another officer were on patrol at the station, and they had a tip that there would be a male passenger who may be transporting illegal items. The investigators boarded the train to look for abnormal luggage. The entire encounter leading up to Garcia's arrest was less than four minutes, and the following is a transcript and description of the exchange as it was captured on Investigator Plowman's body camera.

Investigator Plowman approached Garcia and stood in the aisle next to Garcia's seat.

Plowman: Excuse me, sir?

Garcia: Yeah?

Plowman: My name is Mark Plowman, investigator with the state patrol. No problems, okay, you're not under arrest or anything like that. Do you have a moment to talk to me?

Garcia: Yeah.

Plowman: Do you have your ticket with you by chance?

Garcia: Yeah.

Garcia began looking for his ticket.

> Plowman: Okay.  You're going to Chicago?

> Garcia: Yes sir.

> Plowman: Okay.

Garcia found his ticket and handed it to Investigator Plowman.

> Plowman: Alright, I've got to put my eyes on. I can't see without my. . .

> Garcia: Oh that's the receipt.  That's the ticket.

> Plowman: Okay. And you're Ramon. . .

> Garcia: Ramon Santos.

> Plowman: Santos.  Okay.  Ah you're supposed, okay, alright you're coming from Roseville?

> Garcia: Yes.

> Plowman: Where's home? Chicago or Roseville?

> Garcia: I'm going to Chicago to visit my cousin.

> Plowman: Uh huh.

> Garcia: I haven't seen him for two years.

> Plowman: Uh huh, so you're going up there on vacation?

> Garcia: Yes.

> Plowman: Okay.  How long are you going to be up there?

Garcia: A couple minutes.

Plowman: A couple minutes?

Garcia: A couple days.

Plowman: A couple days?

Garcia: I'm trying to stay there for like a month or so.

Plowman: Okay.  Is this your bag up here?

Garcia: Yes.

Plowman: Do you have any more bags downstairs?

Garcia: No sir.

Garcia reached down and grabbed a portable DVD player box and showed it to Plowman.

Plowman: Okay.  Alright, what we do.  Just that?  What we do is we look for people transporting illegal things: guns, bombs, drugs, stuff like that.  Is there anything illegal in the bag?

Garcia: No, just my. . .

Plowman: No drugs?

Garcia: Just my, just my clothes.

Plowman: No cocaine?

Garcia: Nah.

Plowman: No meth?

Garcia: No I don't have (inaudible).

Plowman: No heroine?

Garcia shook his head "no" in response and said something inaudible.

Plowman: Nothin'? Is it okay if we do a quick search?

Garcia: Um, why you (inaudible)?

Plowman: Well, we get people transport things. It's just, there's no guns right?

Garcia: No.

Plowman: Okay. Would that be okay?

Garcia: Um, I don't know why.

Plowman: Would it be okay if you just opened up for me to make sure?

Investigator Plowman stepped behind Garcia's seat to allow another passenger to walk down the aisle. Garcia then stood up and retrieved his bag from the overhead compartment, placed it on his seat, and opened it.

Plowman: So you're going to go up there for a couple days?

Garcia: I'm trying to stay there for like a month or so.

Plowman: Is it okay if we move some clothes? Is that okay?

Garcia: Um, I don't know why?

Plowman: Or will you just move that, move the pants over for me?

Garcia reached into his bag and moved his clothes to the side for Plowman to look. Plowman grabbed the edge of the bag and pushed it down.

Garcia: That's my other clothes in the bottom.

Plowman: Okay. Can I touch the bottom?

Garcia: Um, I don't know why.

As Garcia responded, Plowman reached his hand into the bag and felt the bottom.

Plowman: Go straight down. Well what happens is that people put stuff right there on some of the things. Could you move the clothes this way a little bit?

Garcia then grabbed his clothes and moved them in the direction that Plowman indicated.

Garcia: That's my dirty underwear.

Plowman: Yeah.

Garcia: My other shirt (inaudible).

Plowman: Mkay, touch right, mkay.

Plowman, again reached into the bag and felt the bottom.

Plowman: Alright. How about, can we go that way then please?

Garcia: Yeah.

Garcia then moved his clothes once more in the direction that Investigator Plowman indicated.

Plowman: I really appreciate this. Okay. What's that right there? Pull that shirt up for me will ya please. Where your free hands are. What's that yellow underneath inside that blue shirt right there?

Garcia: Uh that's just my. . .

Plowman: Right there.

Garcia: Dirty clothes.

Garcia then moved his clothes back to their original position, recovering the area containing the yellow object.

Plowman: Can I touch it?

Garcia did not verbally respond, but he reached into his bag and pulled his clothes back, revealing the yellow mass.

Plowman: Please? Right here.

Plowman then reached down and touched the yellow bundle.

Plowman: Okay. I'll tell you what partner, put your hands behind your back. Okay. You move, I'll hurt ya.

At that point, Garcia was arrested and taken from the train. Investigators found seven black plastic-wrapped bundles of methamphetamine hidden inside a blue shirt in Garcia's bag. Following his indictment, Garcia filed a motion to suppress the evidence from the Amtrak encounter. A magistrate judge conducted an evidentiary hearing on Garcia's motion and concluded that the contact between Investigator Plowman and Garcia was consensual, as was the search of Garcia's bag. The district court adopted the magistrate judge's findings that the encounter and search were consensual and denied Garcia's motion to suppress. Garcia then conditionally pled guilty to one count of Possession with Intent to Distribute 500 Grams or More of

Methamphetamine pursuant to 21 U.S.C. § 841(a)(1), (b)(1)(A). He was sentenced to 120 months incarceration.

## II. Discussion

The issue on appeal is whether the district court erred when it denied Garcia's motion to suppress evidence of the methamphetamine that Investigator Plowman found in Garcia's bag. "We review the district court's factual determinations in support of its denial of a motion to suppress for clear error," and we must affirm the district court's denial of "a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." United States v. Clarke, 564 F.3d 949, 958 (8th Cir. 2009) (internal quotation marks omitted).

Garcia first argues that he did not engage in a consensual encounter with Investigator Plowman, so he was unlawfully seized. "We review . . . the district court's determination of voluntariness for clear error." United States v. Mendoza-Cepeda, 250 F.3d 626, 628 (8th Cir. 2001). Whether "police-citizen contacts fall within the protections of the Fourth Amendment . . . is fact intensive and turns on the unique facts of each case." United States v. Aquino, 674 F.3d 918, 923 (8th Cir. 2012) (internal quotation marks omitted). The government bears the ultimate burden of proving that the encounter was consensual. Id.

As we have repeatedly held, "[a]lthough a person may not be seized without a reasonable suspicion of criminal activity, the [Fourth] Amendment is not triggered by a consensual encounter between an officer and a private citizen." Mendoza-Cepeda, 250 F.3d at 628 (second alteration in original) (internal quotation marks omitted). We examine the totality of the circumstances, considering seven non-exclusive factors, which may indicate a consensual encounter has ripened into a seizure:

-8-

[O]fficers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

Aquino, 674 F.3d at 923 (internal citation omitted) (second alteration in original).

Investigator Plowman approached Garcia on the train and stood between Garcia's seat and the aisle. However, because the train has limited aisle space and other passengers needed access to the aisle, Investigator Plowman's positioning did not unreasonably limit Garcia's movement under the circumstances. Here, like in Mendoza-Cepeda, there were only two officers present, both in plain clothes, and the other officer was standing several seats away. See Mendoza-Cepeda, 250 F.3d at 628 (highlighting that there were only two officers in finding that the encounter between police and the defendant was consensual). Investigator Plowman showed Garcia his badge, but neither investigator displayed a weapon nor physically touched Garcia until he was placed under arrest. See United States v. Correa, 641 F.3d 961, 966 (8th Cir. 2011). Furthermore, neither Investigator Plowman's tone nor the language he used indicated that compliance was necessary. See id. Investigator Plowman asked Garcia if he could search Garcia's bag, but at no point did he touch or exercise control over Garcia's luggage. Finally, when Investigator Plowman approached Garcia, he explicitly stated that Garcia was not in trouble and there was no problem, which indicated that Garcia was not the focus of a particular investigation. Therefore, based on the totality of the circumstances, we find that the district court did not clearly err when it found that the encounter between Garcia and Investigator Plowman was consensual. See Mendoza-Cepeda, 250 F.3d at 628.

Next, Garcia argues that the district court erred in finding that Garcia consented to the search of his luggage. Voluntary consent to a search requires that "the subject of a search [give] consent that was the product of an essentially free and

unconstrained choice." Correa, 641 F.3d at 966 (internal quotation marks omitted). The ultimate question is not whether Garcia "subjectively consented" to the search, "but rather, whether a reasonable officer would believe consent was given." Id. at 967 (internal quotation marks omitted). "The determination of whether a reasonable officer would believe that [the defendant] consented is a question of fact, subject to review for clear error." United States v. Rogers, 661 F.3d 991, 995 (8th Cir. 2011) (alteration in original) (internal quotation marks omitted). Consent may be "inferred from words, gestures, or other conduct." Id. (internal quotation marks omitted). Again, when determining whether there was voluntary consent for a search, "we consider the totality of the circumstances," including:

> [the defendant's] age, education, intelligence, sobriety, and experience with the law; and . . . context . . . , such as the length of . . . questioning, the substance of any discussion . . . preceding the consent, whether the defendant was free to leave . . . , and whether the defendant's contemporaneous reaction to the search was consistent with consent.

Correa, 641 F.3d at 966-67 (finding that the defendant consented to the search because: he appropriately responded to the officer's questions; he was 29 years old; there was no evidence that he was of less than average intelligence; he was sober; a reasonable person would not have felt subject to restraint or coercion; he replied "yes" when officers asked to search his jacket; and his compliance and silence during the search were consistent with consent).

We find that the district court did not clearly err in finding that Garcia voluntarily consented to Investigator Plowman physically searching his bag. Garcia is 26, his answers to the officer's questions were appropriate, and there is no evidence in the record that he was of below average intelligence. See id. Garcia was sober during the search, and the entire encounter took place in less than four minutes. Furthermore, as discussed above, the encounter between Investigator Plowman and Garcia was consensual.

-10-

Although Garcia did not verbally consent to the search—when Investigator Plowman initially asked to search Garcia's bag Garcia responded, "I don't know why?"—Garcia voluntarily complied with Investigator Plowman's requests for Garcia to open the bag and move the contents around himself. During the course of the search, Investigator Plowman reached into the bag three times. The first two times Investigator Plowman reached into the bag, he did so without waiting for Garcia to affirmatively consent to the touching. Assuming without deciding that, as the dissent argues, Garcia initially only consented to a visual search and the first two touches exceeded the scope of his consent, Garcia, through his conduct, expanded the scope of the search by consenting to Investigator Plowman's third physical touch that revealed the drugs Garcia is attempting to exclude. See United States v. Lemmons, 282 F.3d 920, 924-25 (7th Cir. 2002) (finding that though the defendant originally only consented to a limited search of his trailer home, the defendant expanded the boundaries of the search by aiding officers in the search and showcasing evidence that had not been included in his original scope of consent).

Significantly, the final time that Investigator Plowman asked Garcia if he would move the contents of the bag around so that he could look through them, Garcia complied by moving his clothing aside, revealing the bundle of controlled substance. Upon seeing the bundle, Investigator Plowman asked Garcia what it was, to which Garcia replied, "my dirty clothes," and put the clothes back in their original position. Investigator Plowman asked if he could touch it and waited for a response. Garcia then reached back into his bag and moved his clothes aside, revealing the bundle to Investigator Plowman once more. Based on this act of moving the clothes aside when Investigator Plowman asked to touch the bundle, a reasonable officer would have inferred that Garcia's conduct indicated consent for Investigator Plowman to reach into the bag and touch the yellow bundle. See Rogers, 661 F.3d at 995. Balancing these circumstances, the district court found that Garcia's behavior was consistent with consent. After examining the district court's decision, we find that the district court did not clearly err in finding Garcia voluntarily consented to the search. See Correa, 641 F.3d at 966-67.

-11-

# III. Conclusion

For the foregoing reasons, we affirm the district court's denial of Garcia's motion to suppress.

KELLY, Circuit Judge, dissenting.

I agree that the encounter between Investigator Plowman and Garcia started as a consensual one. Plowman approached and engaged Garcia in conversation, asking about his destination and the purpose of his travel. He informed Garcia that he was engaged in drug interdiction and asked to see Garcia's ticket. And he asked Garcia for consent to search his bag. The law regarding consent to search is clear. As the court explains, we look at the circumstances present and determine whether, under those circumstances, "a reasonable officer would believe consent was given." Correa, 641 F.3d at 967 (quoting United States v. Pena-Ponce, 588 F.3d 579, 584 (8th Cir. 2009)). However, we also must determine the scope of any consent given. As we have stated, "[t]he boundaries of a consensual search are confined to the scope of the consent." United States v. Shafer, 608 F.3d 1056, 1064 (8th Cir. 2010). And, as with consent generally, we rely on "a standard of objective reasonableness." Id. "To determine the scope, we consider what the typical reasonable person would have understood by the exchange between the officer and the suspect." Id. at 1064–65 (cleaned up).

A reasonable person would have understood that Garcia consented to a visual search of his bag. Garcia opened the bag for Investigator Plowman when asked. And I agree that there is nothing about Garcia's "age, education, intelligence, sobriety, [or] experience with the law," Correa, 641 F.3d at 966 (quoting United States v. Va Lerie, 424 F.3d 694, 709 (8th Cir. 2005) (en banc)), that would render his consent involuntarily given. But a reasonable person would have understood that the scope of Garcia's consent did not extend to a physical search. When Plowman directly asked to search Garcia's luggage, Garcia responded by asking "Um, why . . . ?"

-12-

When asked again, Garcia said "Um, I don't know why." The court here agrees that—under the objective reasonableness standard—these statements did not constitute verbal consent, and, indeed, Plowman testified that he understood Garcia's use of the phrase "I don't know why" to be a denial of consent. So, Plowman next asked if Garcia would open the bag himself. Garcia, maintaining possession and control of his bag, implicitly consented when he removed his bag from the overhead rack and unzipped it. Plowman then asked if he (Plowman) could move the clothing in the bag, and Garcia again said "Um, I don't know why"—another denial of consent for a physical search. Plowman then suggested that Garcia move the clothes himself, saying "Or will *you* just move that . . . ." Only then, while still maintaining physical custody of the bag, did Garcia comply with the request. And at no time during this back and forth did Garcia give Plowman consent—explicitly or implicitly—to conduct a physical search of his bag.

Nonetheless, Investigator Plowman asked if he could touch the bottom of Garcia's bag. But this time, he didn't wait for a response before reaching into the bag and touching the bottom. And as Plowman reached in, Garcia gave the same denial he had given twice before: "Um, I don't know why." This was a search to which Garcia did not consent. See Shafer, 608 F.3d at 1064–65; see also Florida v. Jimeno, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is . . . what would the typical reasonable person have understood by the exchange between the officer and the suspect."). I agree that—up to that point—Garcia's actions in complying with Plowman's step-by-step requests had been "consistent with consent." But they are consistent with consent only to the extent that he did, in fact, comply. Garcia complied only with the requests for a visual search, and had denied previous requests for a physical search. When Plowman reached into the bag and touched the bottom, before getting any response from Garcia, that physical search exceeded the scope of any implicit consent Garcia had previously given. That began a violation of Garcia's Fourth Amendment rights.

-13-

I also disagree that Garcia expanded the scope of any implicit consent he had given. Once Plowman physically searched Garcia's bag without his consent, there was no reason for Garcia to believe that continuing to limit the scope of his consent would be of any consequence. Lemmons is not to the contrary. 282 F.3d at 924–25. A person *can* expand the boundaries of consent after initially limiting them. But the defendant in Lemmons, unlike here, did so voluntarily—even eagerly. Id. at 925 ("[O]nce the search began, Lemmons started showcasing his photographs as though they were vacation souvenirs. . . . When [the officer] asked, on the heels of viewing Lemmons' pictures, whether there was anything on the computer that he needed to be aware of, Lemmons invited [him] to check."). And the officer in Lemmons never exceeded the scope of Lemmons's consent. Here, the scope of Garcia's consent was limited; Plowman exceeded that scope when he physically reached into Garcia's bag; and no reasonable officer would believe that Garcia's acquiescence to Plowman's subsequent actions amounted to voluntary consent to expand the scope of the search. For these reasons, I respectfully dissent.

—————————————————